# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **BILLY JOE VAUGHN, JR.,**   Plaintiff | ) ) |
| v. | ) Civil Action No. 2:16cv00012 |
| | ) **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,**[1] **Acting Commissioner of Social Security,** | ) ) ) ) |
| Defendant | ) By: PAMELA MEADE SARGENT |
| | ) United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Billy Joe Vaughn, Jr., ("Vaughn"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Vaughn filed applications for DIB and SSI on December 15, 2010, alleging disability as of June 15, 2008. (Record, ("R."), at 221-22, 229-37.) The claims were denied initially and on reconsideration. (R. at 72-84, 86-98, 100-14, 116-30, 132-34, 140-44, 146-51, 153-55.) Vaughn requested a hearing before an administrative law judge, ("ALJ"), which was held on January 15, 2013. (R. at 34-71, 156-57.) By decision dated February 1, 2013, an ALJ denied Vaughn's claims. (R. at 20-28.) The Appeals Council thereafter denied Vaughn's request for review. (R. at 1-3.) Vaughn appealed the denial of benefits to this court. On the Commissioner's motion, this court remanded Vaughn's claims to the Commissioner for further development on October 23, 2014. *See Vaughn v. Colvin*, Civil Action No. 2:14cv00010 (W.D. Va. Oct. 23, 2014). On remand, the ALJ held another hearing on August 6, 2015, at which Vaughn was represented by counsel. (R. at 513-49.)

By decision dated August 14, 2015, the ALJ again denied Vaughn's claims. (R. at 491-505.) The ALJ found that Vaughn met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013. (R. at 494.) The ALJ found that Vaughn had not engaged in substantial gainful activity since June 15, 2008, the alleged onset date. (R. at 494.) The ALJ found that the medical evidence established that Vaughn had severe impairments, namely degenerative

disc disease and spondylosis of the cervical spine with radiculopathy into the right upper extremity, right shoulder bursitis and chronic low back pain, but he found that Vaughn did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 494-97.) The ALJ found that Vaughn had the residual functional capacity to perform sedentary work, except that he could lift and carry items weighing up to 20 pounds occasionally and 10 pounds frequently,[2] that he must be allowed position changes between sitting and standing every 20 minutes, that he cannot perform more than occasional climbing of ramps and stairs, kneeling, crawling, crouching, balancing and stooping and that he cannot climb ladders, ropes or scaffolds or work in concentrated exposure to cold, wetness, unprotected heights and hazards. (R. at 497-503.) The ALJ found that Vaughn was unable to perform his past relevant work. (R. at 503.) Based on Vaughn's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Vaughn could perform, including jobs as an addresser, a packing machine operator and a sorter. (R. at 503-04.) Thus, the ALJ concluded that Vaughn was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 504-05.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

After the ALJ issued his decision, Vaughn pursued his administrative appeals, (R. at 478-79, 487), but the Appeals Council denied his request for

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

review. (R. at 471-74.) Vaughn then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Vaughn's motion for summary judgment filed October 27, 2016, and the Commissioner's motion for summary judgment filed December 30, 2016.

## II. Facts

Vaughn was born in 1972, (R. at 519), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Vaughn has a seventh-grade education and past relevant work as roof bolter in an underground coal mine. (R. at 519.) Vaughn testified that he has not worked since 2008. (R. at 519.) At his January 15, 2013, hearing, Vaughn testified that he suffered from constant pain that improved some when he took his pain medication. (R. at 631.) He complained that his pain medication made him drowsy. (R. at 636.) Vaughn said that he experienced neck pain that ran down his right arm. (R. at 636-37.) Vaughn also claimed that he had no strength to grip anything with his right hand. (R. at 637-38.)

Medical expert Dr. Anthony E. Francis, M.D., an orthopedic surgeon, testified at Vaughn's August 2015 hearing. (R. at 521-38.) Based on his review of the medical evidence, Dr. Francis testified:

> The pathology that we have here would be some degenerative disk disease of the lumbar and cervical spine, with an intermittent radiculopathy. Now, the problem … with radiculopathy, especially looking at them over an extended period of time, is that the radiculopathy may be, or usually is, acute at some point, meaning severely impairing due to pain, weakness, all the other things that go along with the radiculopathy.

> Most radiculopathies are going to clear up. You know, if you don't do anything, they'll clear up….
> But most of them, especially in a younger patient, are going to clear up and either go completely away, or just become sort of a nuisance instead of a significantly impairing problem, and that may be what we have here.

(R. at 528-29.)

In rendering his decision, the ALJ reviewed records from Wellmont Lonesome Pine Hospital; Lee Regional Medical Center; Blue Ridge Neuroscience Center, P.C.; Wellmont Rehabilitation Services; Jonesville Rural Health Clinic; Dr. Kevin Blackwell, D.O.; Medical Associates of Jonesville; Stone Mountain Health Clinic, St. Charles; Simpson Clinic; Eugenie Hamilton, Ph.D.; and Dr. Richard Surrusco, M.D..

On October 14, 2010, Vaughn was seen at the emergency department at Lonesome Pine Hospital for neck pain radiating into his right shoulder and arm. (R. at 337.) Vaughn denied any recent injury or repetitive motion. (R. at 337.) A physical examination revealed normal range of motion in Vaughn's neck. (R. at 338.) No sensory or motor loss was noted. (R. at 338.) A CT scan of Vaughn's cervical spine revealed mild to moderate degenerative disc changes at the C4-5 and C5-6 levels. (R. at 339, 364.) X-rays of his cervical spine showed degenerative disc changes at the C5-6 and C6-7 levels with loss of cervical curvature due to muscle spasm of the neck. (R. at 361.) Vaughn's was diagnosed with cervical radiculopathy. (R. at 338.) Vaughn returned to the emergency department at Lonesome Pine Hospital on October 19, 2010, with complaints of chronic neck and back pain. (R. at 345.) Physical examination revealed painful range of motion in Vaughn's neck with normal range of motion in his back. (R. at 346.)

G. Elaine Hamilton, F.N.P., saw Vaughn at Jonesville Rural Health Clinic on October 21, 2010, for complaints of neck and arm pain. (R. at 393.) Physical exam revealed that Vaughn's neck was tender and painful to palpation, more on the right side. (R. at 393.) Vaughn was given prescriptions for Lortab, Soma, ibuprofen and Xanax, and an MRI was ordered of his cervical spine. (R. at 393.) Vaughn returned on November 2, 2010, complaining of neck pain radiating into his right arm and numbness in his fourth finger through thumb. (R. at 392.) Physical exam revealed decreased range of motion in Vaughn's neck. (R. at 392.) Vaughn returned on November 17, 2010, with similar findings. (R. at 391.)

An MRI of Vaughn's cervical spine was performed at Lee Regional Hospital on November 19, 2010. (R. at 351-53.) The MRI showed a deformity of the vertebrae at the C6-7 level, most likely related to an old fracture, and mild multilevel spondylosis with central disc protrusions at the C4-5 and C5-6 levels. (R. at 352, 362-63.) As a result of the MRI findings, Hamilton referred Vaughn to a neurosurgeon. (R. at 390.)

On January 4, 2011, Dr. David M. Pryputniewicz, M.D., with Blue Ridge Neuroscience Center, P.C., saw Vaughn. (R. at 357-60.) Dr. Pryputniewicz noted that Vaughn complained of cervical pain and right upper extremity pain for the previous four to five months. (R. at 357.) Vaughn complained of numbness in his right arm, hand and fingers and generalized weakness in his arm. (R. at 357.) Dr. Pryputniewicz noted that Vaughn was alert, cooperative and in no apparent acute distress. (R. at 358.) He stated that examination of Vaughn's neck revealed mild muscle spasms and tenderness and limited range of motion. (R. at 358.) Strength and muscle tone of Vaughn's upper extremities was normal. (R. at 358.) Dr. Pryputniewicz diagnosed Vaughn has having cervical spondylosis, without

myelopathy; cervical degenerative disc disease; cervical herniated disc, without myelopathy; neck pain; cervical radiculopathy; and arm pain. (R. at 359.) He recommended conservative treatment and prescribed Medrol and four to six weeks of physical therapy. (R. at 360.) He scheduled Vaughn to return to see him on February 22, 2011, and cautioned that surgical intervention might be necessary if Vaughn's symptoms persisted. (R. at 360.)

A Physical Therapy Evaluation was performed on Vaughn on January 18, 2011, at Wellmont Outpatient Rehabilitation Services at Lonesome Pine Hospital. (R. at 369-70.) Vaughn called and canceled his return appointment on January 20, 2011. (R. at 379.) Vaughn returned for physical therapy on January 25, 2011, and then never returned. (R. at 380-82.)

Vaughn returned to see Hamilton on February 9, 2011, stating that he had an abcessed tooth, which had caused him to miss two physical therapy appointments that week. (R. at 416.) He also complained of intolerable neck pain without pain medication. (R. at 416.) Hamilton increased Vaughn's Percocet dosage. (R. at 416.) On March 8, 2011, Vaughn reported that the pain in his neck and arm was "much improved" with the increased dosage of Percocet. (R. at 415.) Vaughn stated that since the pain medication had decreased his pain, he did not want to have surgery on his neck and had applied for Social Security disability benefits. (R. at 415.) Hamilton noted a limited range of motion in Vaughn's neck and right arm. (R. at 415.) On April 6, 2011, Hamilton noted that Vaughn stated that he had quit physical therapy after only three sessions because it had increased his pain. (R. at 414.) Hamilton recommended that Vaughn return to see the neurosurgeon. (R. at 414.) She also stated that she had tried to decrease Vaughn's Percocet dosage and

would require him to bring in his prescription each month to do a pill count. (R. at 414.)

On May 31, 2011, Vaughn did not bring in his pill bottle, and Hamilton noted that, if he forgot it again, she would not prescribe any further pain medication. (R. at 413.) On June 23, 2011, Hamilton noted that Vaughn brought in his pill bottle for a pill count and that he was complaining of increased pain in his low back. (R. at 412.) Vaughn said that he was awaiting a call from the neurosurgeon to schedule a return appointment after he had canceled his last appointment due to emergency surgery. (R. at 412.)

On August 2, 2011, Vaughn told Hamilton that his pain had decreased with his pain medication. (R. at 470.) On September 13, 2011, Vaughn told Hamilton that he had experienced a strange sensation approximately one week earlier and that his left arm and leg had felt weak since. (R. at 469.) Hamilton recommended that he return to see his neurosurgeon, and Vaughn reported that he had called the neurosurgeon's office to request a follow-up appointment and was told the office would call him when they had an opening. (R. at 469.) Vaughn complained of increased pain on December 20, 2011, and Hamilton ordered physical therapy. (R. at 467.)

Dr. Kevin Blackwell, D.O., performed a consultative examination of Vaughn on October 16, 2011, at the request of the state agency. (R. at 432-435.) Vaughn complained of neck and back pain for the previous 10-12 years, worsening in the previous year. (R. at 432.) Vaughn claimed that he was supposed to start physical therapy soon. (R. at 432.) Vaughn complained of severe pain and said that he was taking no pain medication. (R. at 432.) Later in the report, Dr. Blackwell

noted that Vaughn said he was taking Xanax, Atenolol, Percocet, Soma and ibuprofen. (R. at 432.) Dr. Blackwell noted that Vaughn was alert, cooperative, oriented times three with good mental status and in no apparent acute distress. (R. at 433.)

Dr. Blackwell noted that Vaughn's neck was supple and nontender, his gait was symmetrical and balanced, his shoulder and iliac crest height was good and equal bilaterally, his upper and lower extremities were normal for size, symmetry and strength, his grip strength was good, his fine motor movement skills of the hands were normal, and his reflexes were within normal limits. (R. at 434.) Dr. Blackwell stated that, based on his physical examination, Vaughn should be able to sit for four to six hours in an eight-hour workday and stand for one to two hours in an eight-hour workday with changes in postural positions every 15 to 20 minutes. (R. at 434.) He stated that Vaughn could operate a vehicle, bend at the waist, kneel, reach above his head and operate foot pedals one-third of the day or less, and he should avoid squatting, stooping, crouching and crawling. (R. at 435.) He stated that Vaughn could occasionally lift up to 35 pounds and frequently lift up to 15 pounds. (R. at 435.)

Vaughn returned to physical therapy at Wellmont Outpatient Rehabilitation Services on January 12, 2012, and continued through February 23, 2012. (R. at 437-52.) He again quit therapy and did not return. (R. at 452.)

On March 1, 2012, Vaughn reported increased pain to Hamilton since starting physical therapy. (R. at 465.) On May 30, 2012, Hamilton's notes reflect that she confronted him about quitting physical therapy. (R. at 463.) Vaughn stated

that he quit because his pain got worse every time he participated in physical therapy. (R. at 463.)

On August 29, 2012, Vaughn reported acute increased pain to Hamilton, but he reported no new problems. (R. at 461.) Hamilton also completed a Medical Evaluation form for Vaughn on this date. (R. at 458-59.) On this form, Hamilton checked a box indicating that Vaughn was not able to participate in employment and training activities in any capacity and would be unlikely to do so for 12 months. (R. at 458.) Hamilton stated that Vaughn was disabled based on physical limitations, but she did not list any specific restriction on his work-related activities. (R. at 459.) Hamilton noted that Vaughn needed additional evaluation by his neurosurgeon to determine current and future functioning, but she stated that he had no follow-up appointment scheduled with his neurosurgeon. (R. at 459.)

On February 21, 2013, Hamilton noted for the first time that Vaughn's neck problems started when he fractured his C4, C5, C6 and C7 vertebrae in a mining accident. (R. at 761.) Hamilton also complained of severe pain in his low back on this occasion. (R. at 761.) On March 29, 2013, Vaughn complained to Hamilton that his pharmacy had changed the generic Percocet he was receiving and that the new kind did not work to control his pain. (R. at 759.) Vaughn stated that he was out of pain medication, even though he could not refill his prescription until April 5, because he had to increase the amount he took to control his pain. (R. at 759.) Hamilton also noted that Vaughn had a full range of motion without tenderness in his neck. (R. at 760.) On May 30, 2013, Vaughn again complained of worsening pain, which forced him to take more of his pain medication than prescribed. (R. at 755.)

On July 8, 2013, Hamilton noted that she could not see Vaughn or prescribe him narcotic pain medication because Vaughn had let his insurance lapse. (R. at 754.) On August 5, 2013, Vaughn complained of being without pain medication for almost a month. (R. at 751.) Vaughn stated that he had recently fallen in the bathtub and had sought treatment at local emergency departments. (R. at 751.) He requested referral to a pain management specialist. (R. at 751.)

Records from Lonesome Pine Hospital Emergency Department show that Vaughn sought treatment there on August 3, 2013, and again on August 4, 2013, for back and neck pain due to a fall at home. (R. at 765-94.) The August 4 records reflect that Vaughn also sought treatment on August 3 at Lee Regional Hospital Emergency Department. (R. at 778.) X-rays of Vaughn's cervical spine taken on August 3, 2013, showed no acute bony lesions, but a congenital defect at the C6 level and significant degenerative disc changes at the C5-6 and C6-7 levels with bulging disc noted, impinging on the thecal sac at the C5-6 level. (R. at 773.) On August 3, Vaughn was given Toradol and Demerol injections and discharged. (R. at 767.) On August 4, the examining physician noted neck and back tenderness and spasm with normal neurologic distal examination. (R. at 777.) The physician noted no evidence of lower extremity weakness and no specific sensory findings. (R. at 777.) Vaughn was given two doses of Percocet and was encouraged to follow up with his primary physician. (R. at 778.)

On September 4, 2013, Hamilton noted that recent x-rays showed a bulging disc impinging on the thecal sac. (R. at 846.) She stated that Vaughn needed surgery, but was "scared to death" to have it done. (R. at 846.) She recommended an orthopedic referral for epidural injection. (R. at 846.) On October 2, 2013,

Vaughn said that he had not received an orthopedic appointment. (R. at 843.) He stated that his pain was "terrible all the time." (R. at 843.)

Vaughn presented to the Emergency Department at Lonesome Pine Hospital on October 11, 2013, where he was seen by Dr. Glenn Quarles, M.D. (R. at 923-33.) Dr. Quarles noted that Vaughn appeared to be "moderately intoxicated." (R. at 926.) A blood test showed no alcohol in Vaughn's system, however. (R. at 929.) Radiographic images were normal, except for evidence of degenerative disc disease in Vaughn's cervical spine. (R. at 930-33.)

Kellie Brooks, F.N.P., at Stone Mountain Health Clinic St. Charles, saw Vaughn as a new patient on September 24, 2014. (R. at 864-66.) Brooks noted that Vaughn came in requesting prescriptions for Percocet, Soma and Xanax after being terminated from treatment by Hamilton for missing a urine drug screen and pill count. (R. at 864.) Vaughn stated that he had been getting his medication "off of the street." (R. at 864.) Vaughn complained of neck, low back and knee pain. (R. at 864.) Brooks noted that Vaughn refused any nonnarcotic alternative medications. (R. at 864.)

Vaughn saw Dr. Leigh A. Young, M.D., at the Simpson Clinic on October 17, 2014. (R. at 868-78.) On this occasion, Vaughn again claimed that he was involved in a mining accident in 2006 that resulted in six fractured vertebrae. (R. at 868.) Vaughn complained of right-sided neck pain with radiating pain to his elbow, a weakening in his arm and hand and loss of feeling in four fingers. (R. at 868.) Vaughn also complained of low back pain and bilateral knee pain. (R. at 868.) Dr. Young's examination showed mild crepitus in both knees with free range of motion, as well as palpable muscle spasm in Vaughn's lumbar and thoracic spine

with no neurological focal deficits. (R. at 869.) Dr. Young prescribed Voltaren gel, oxycodone, Baclofen, Doxepin and alprazolam. (R. at 869.)

On November 13, 2014, Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment. (R. at 895-902.) He opined that Vaughn could lift items weighing up to 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 896.) He stated that Vaughn could occasionally climb ramps/stairs/-ladders/ropes/scaffolds, stoop, kneel, crouch and crawl. (R. at 897.) Dr. Surrusco also stated that Vaughn's ability to reach was limited. (R. at 898.)

Vaughn returned to the Simpson Clinic on December 3, 2014, and was seen by Dr. Harland Simpson, M.D. (R. at 903.) Dr. Simpson noted that Vaughn had missed his last appointment. (R. at 903.) At one point, Dr. Simpson noted that Vaughn missed his appointment due to pain; at another point, Dr. Simpson said that he missed the appointment for financial reasons. (R. at 903.) Dr. Simpson noted that Vaughn's missed appointment would be considered a failed pill count and that he would not write Vaughn any more prescriptions for narcotic medication if he missed another appointment. (R. at 903.) Vaughn claimed that he had been out of pain medication for the previous two weeks except that he had saved two pills for the ride to the doctor. (R. at 903.) At another point in the records, it was noted that Vaughn claimed that he had not taken any medication in more than week, even though he tested positive for the use of oxycodone and benzodiazepines. (R. at 909.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Vaughn argues that the ALJ erred by failing to find that his condition met or equaled § 1.04(A) of the Listing of Impairments. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-13.) Vaughn also argues that the ALJ erred by failing to properly evaluate the findings of Dr. Blackwell, a consultative physician. (Plaintiff's Brief at 13-16.)

To qualify for benefits based on the listed impairment for disorders of the spine, found at 20 C.F.R. Pt. 404, Subpt. B, App. 1, § 1.04(A), a claimant must show that he suffers from a disorder of the spine resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, with evidence of nerve

root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine and motor loss accompanied by sensory or reflex loss. The regulations' basic definition of disability requires that a physical or mental impairment be expected to result in death or has lasted or is expected to last for a continuous period of not less than 12 months. *See* 20 C.F.R. §§ 404.1505, 416.905 (2016). A claimant's condition must meet a listed impairment and the durational requirement to be considered disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (2016).

In reaching his decision that Vaughn's condition did not meet or equal § 1.04(A), the ALJ wrote:

> …The current evidence … fails to establish an impairment that is accompanied by all of the required signs that are reflective of listing-level severity. Also, the claimant's treating and examining physicians of record have not reported each required necessary clinical, laboratory, or radiographic finding specified in the listings.

(R. at 495-96.) The ALJ stated that he gave "great weight" to the opinion of Dr. Francis that Vaughn's condition did not meet this listed impairment because Vaughn had not consistently exhibited a neuro-anatomic distribution of pain for 12 consistent months. (R. at 496-97.) Dr. Francis agreed that the medical evidence of record showed that Vaughn had been diagnosed with cervical radiculopathy and possible nerve root compression as early as 2010. (R. at 496.) Dr. Francis also agreed that Vaughn had exhibited limited range of motion, muscle weakness or sensory loss at times through 2013, but he also noted that Vaughn's physical examination sometimes also showed none of these findings. (R. at 496.)

In particular, the medical record shows Dr. Blackwell noted no limitation of motion on October 16, 2011. There also was no evidence of any motor, reflex or sensory deficits. Vaughn was treated at the emergency room in August and October of 2013 for neck pain, and, on each occasion, he denied any radiating symptoms or weakness in his arms. Physical examination revealed full strength and sensation. On January 4, 2011, Dr. Pryputniewicz noted normal strength and tone in Vaughn's upper extremities. All this evidence supports the ALJ's finding that Vaughn's impairment did not meet or equal the Listing at § 1.04(A).

Vaughn also argues that the ALJ erred by failing to give full consideration to the findings of Dr. Blackwell. (Plaintiff's Brief at 13-16.) The ALJ noted that he was giving "some weight" to the opinions of Dr. Blackwell. (R. at 501.) In particular, the ALJ adopted Dr. Blackwell's opinions that Vaughn's work-related activities should be limited to walking and standing no more than two hours in an eight-hour workday, sitting no more than six hours in an eight-hour workday and being able to shift positions every 20 minutes. (R. at 501.) The only opinion of Dr. Blackwell's that the ALJ rejected was his opinion that Vaughn could lift 15 pounds frequently and 35 pounds occasionally and that Vaughn should avoid squatting, stooping, crouching and crawling. (R. at 501.) The ALJ, instead, found that Vaughn could lift only 10 pounds frequently and 20 pounds occasionally. (R. at 497, 501.) The ALJ also placed restrictions on Vaughn's ability to reach, handle and finger and kneel, crawl, crouch, stoop, balance or climb ramps or stairs, but he did not prohibit these activities. (R. at 497, 501.) The ALJ stated that he adopted greater restrictions on Vaughn's ability to lift than those of Dr. Blackwell based on the credibility of Vaughn's testimony regarding his symptoms and the limiting effects of his symptoms. (R. at 501.) Vaughn's testimony supports this restriction. I also note that the state agency physician's residual functional capacity evaluation

supports the lesser restrictions on Vaughn's ability to squat, stoop, crouch and crawl.

Based on the above-stated reasons, I find that the substantial evidence supports the Commissioner's decision that Vaughn was not disabled. An appropriate Order and Judgment will be entered.

DATED: August 14, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE